24-78, 25-36, and 25-38, Fezzani v. Dweck v. Wilson & Co. Good afternoon, Your Honors. May it please the Court, I'm Max Falkenflik of Falkenflik & McGarrity LLP, Counsel for the Plaintiffs. This is the third time I have appeared before this Court to appeal the dismissal of this 26-year-old case. The prior two dismissals were on motions to dismiss, and this Court reversed both. This time, the district court granted defendants motions for summary judgment. And as we show in our papers on appeal, the evidence submitted by plaintiffs on the motions was so strong that not only must the grant of summary judgment be reversed, but we respectfully urge the Court to search the record and enter judgment for the plaintiffs and put an end to this 26-year-old case. A.R. Barron defrauded its customers, such as plaintiffs, by falsely representing, and I'm quoting a prior opinion of this Court, that the price Barron charged its customers for securities was established in a market independent of artificial trading by Barron itself. And that's in the 2013 decision of this Court. Barron was liquidated by a bankruptcy trustee appointed by the Securities Investor Protection Corporation, or SIPC. Thirteen Barron officers and employees were criminally convicted and sentenced to jail. Aaron Morris and Abraham Wolfson and Isaac Dweck are alleged to have been aiders and abettors and co-conspirators with Andrew Bressman, Barron's criminally convicted chief executive officer. These defendants actually participated in the fraud themselves by allowing Bressman to engage in manipulative trading in the numerous accounts they controlled. The Wolfsons controlled 11. Dweck controlled 9. Right, so there isn't really a dispute that they knew that there was parking and wash sales going on in those accounts, right? Not only that, sir, but yes. That means that they know that there is some kind of artificial inflation of the price. Do we also have to know that Barron was making representations to clients about the nature of the market and inducing them to purchase the securities? And we absolutely presented evidence of that by Roman Okun, who was the sales representative who communicated each of the plaintiffs. And Mr. Okun said in paragraph 9 of Mr. Okun's deposition, Mr. Okun said that, quote, I was always portraying Barron as conducting its business as a regular brokerage firm and never disclosed to any of them that Barron was really engaged in a criminal pump-and-dump operation. And that's Oakland Declaration, paragraph 9 at 8, 3853. So there are misrepresentations from the salesmen, and the alleged aiders and abettors know that there's parking and wash sales going on. It's not just known. You have to show their actual knowledge of the misrepresentations. So, you know, like, is there something connecting them? I mean, they might have thought, we're just, you know, pumping up the price of the house shares to make the business look better in general, as opposed to being engaged in a pump-and-dump scheme. And, Your Honor, the flaw, respectfully, with Your Honor's presentation there, is that the aiders and abettors have to actually know about specific misrepresentations to the plaintiffs. Under aiding and abetting law for many, many years and under this Court's precedent, all that the aiders and abettors have to know is that there is a predicate fraud. And there's no question they knew that Barron was involved in the predicate fraud. Not only were they directly informed by Mr. Bressman and Mr. Oken that there was a predicate fraud. And what is the predicate fraud? The predicate fraud is the fraud that this Court found. The predicate fraud is that Barron was charging its customers for securities in a market and that the price it was charging was established in a market independent of artificial trading. The predicate fraud was there was no market. But is it enough, is it enough that Barron is just selling securities at the inflated price? Or as you said, I thought you acknowledged a moment ago, there had to be evidence that they were making some kind of misrepresentation to the buyers about where the price came from? No, absolutely not. The, the... Well, ask about what? Absolutely not that they have to make misrepresentations to the buyers. Okay. Absolutely, clearly, and I cited in our, in our opening brief, that this Court has held that there's an implied representation, that there's an actual market for securities when a broker sells securities to its clients. Here, there was no actual market. Every price, every sale, every purchase was established arbitrarily by Barron. And the defendants, represented by my friends over here at the defense table, the defendants actually participated in manipulative transactions. We have the affidavit of Mr. Kelly, our expert, who has charts showing that they had multiple accounts. In some cases, they sold in one account at a price and bought in another account at the same, on the same day. But, but knowledge of the fraud for aiding and abetting requires knowledge of misrepresentations being made by Barron. And you were, I think you were going to say that Okun and Bressman, in their declarations or in their depositions, made statements to that effect, but I, I, I guess I didn't hear where. Where? At paragraph nine of Okun's declaration, and I cited it at... And so he says there that he understood... At A3853. The knowledge is of, which Judge Menaschew was just describing, the general, what, what... No, no, no. The knowledge is the specific misrepresentation that Barron was not engaged this, the fraudulent omission to disclose that Barron was not engaged... So that's a fraudulent omission to disclose? That's the theory that... Not, not only that, he said that it was, he, that they were conducting business as a regular brokerage firm when they were not. Okay. So that, again, those are to both different things than I think what an aiding and abetting for a fraud, a fraud requires. Respectfully, Your Honor, I don't think those are different things, and I don't think that aiding and abetting... But the theory you started out with, I, I think, was not that Barron's was a legitimate firm. I, that, that's significantly broader than the theory alleged in the complaint, isn't it? No, Your Honor. We made it clear in the complaint, and this is not a motion to dismiss, it's a motion for summary judgment. And we submitted evidence showing that Barron was not a legitimate firm, that these defendants participated in the fraud itself through manipulative trading in their accounts, that these defendants were aware and actually, Your Honor, under aiding and abetting law, not only can you prove actual knowledge, and we did prove actual knowledge, but you can prove under the Oster case in New York law, you can prove it by the circumstances surrounding everything. So you say in the, in the complaint, right, to control purchases, the brokers were directed to generate orders by disseminating any favorable information, suppressing any material adverse information, fabricating false and misleading favorable information, thereby securing fraudulently generated purchases that created sufficient demand to force up the price limit with securities. When that failed, Barron impeached him of widespread unauthorized purchases, right? But you're saying, actually, they didn't have to. So, like, I think you just said in answering the question for me, it was not necessary to your allegations to say that they disseminated favorable information. It would be enough that they're just trading at what they know to be an artificially inflated price? No. It is, first of all, Your Honor, this is not a motion to dismiss. The complaint is to a large extent irrelevant on this motion, even though the district court relied on the complaint and rather than the evidence submitted on the motion for summary judgment. So the district court thinks, what is the fraud that I'm trying to identify? It's a pump-and-dump scheme. That requires misrepresentations by the seller to the buyer, and there's no evidence of actual knowledge by the alleged aiders and abettors of those misrepresentations. You're saying that was wrong. Why? Because the evidence showed a different fraud than the pump-and-dump scheme? No, Your Honor. The evidence showed that there was a pump-and-dump scheme, not much question about it. This Court had previously in its prior decisions found that there was a pump-and-dump scheme and that Barron was committing fraud. And aiding and abetting law only requires that you know there's a fraud, you know there's a fraud being conducted, and you engage in that you substantially assist in the commission of the fraud. What? A fraud or the same fraud is the principle. What's required is that the aider and abettor knew of the fraud that Barron was committing. A fraud. A fraud. A fraud. So your argument now is that what Wolfson's and Dweck's knew and the declarations of open arrestment said was that as long as they knew of something fishy with Barron's, that that's sufficient for their aiding and abetting liability. Not something fishy, Judge Park. Fraud. Not something fishy that they knew there was actual fraud occurring. And this Court has previously found in prior decisions rendered by this Court in this case, previously found there was actual fraud occurring. And there is no question that if an aider and abettor knows there is actual fraud occurring and does something to make that happen, to substantially assist in that, and the district court found that the. Can I ask the question this way? Yeah. Let's say that Dweck's and Wolfson's knew that there was parking and wash sales going on, but what they thought was happening was Barron was artificially inflating the price of its house stock so as to appear to be a healthier enterprise to regulators, but thought that nobody was actually trading at those prices. So no, like, regular buyers were being defrauded. Would that be enough to say that they were an aider and abettor of the pump and dump scheme? I think that if they knew. First of all, Your Honor keeps focusing on parking and wash sales. That's not what we're focusing only about. We are saying the fraud was that Barron never had a market for any of its stocks and only established its price through its own artificial trading that the defendants The parking and wash sales is the artificial trading. It's not only parking and wash sales. Okay. It goes beyond that. So let's say they're aware of the artificial trading, but think that the point of that is to deceive regulators so they don't actually know that it's being sold to the clients of Barron. Would that be enough to say that they're aiding and abetting the pump and dump scheme? Your Honor, it would be enough to show that they were aiding and abetting if they substantially insisted Barron. And the finding of the court below was that there was substantial assistance and there's no question about it. Right. So the only question is the knowledge. If they knew there was a I was trying to simplify it to say they know about the artificial trading, but they do not know about any sales to any of the plaintiffs. Would that be enough? Yes, I think it would be. But, Your Honor, it's inconceivable that if these defendants were aware that there was artificial trading and they participated in artificial trading, it is inconceivable that they thought the other people who were not favored investors let's remember what Bressman told these people is that there were favored investors who would receive money and others would not if you let me, according to Bressman. It should have been obvious to them that there were non-favored investors who were buying the stocks at the inflated rate. That's one of the things I'm saying, but that's not That's constructive knowledge as opposed to actual knowledge. No, but it's not even necessary, Your Honor. The decision going back way back to Judge Hand over there made it clear that if you substantially assist these defendants in committing their fraud and you know there is a fraud, that's enough for aiding and abetting. And we also have the issue of conspiracy, Your Honor. There isn't any question that we proved conspiracy. There was an actual agreement by these people that they would participate in the fraudulent activities, and they did. There was an actual agreement. And, in fact, this Court's decision in the Freeman case, this Court's decision makes clear that you don't have to have an actual agreement. You can have only a tacit agreement. And their conduct proves they were tacitly agreed to be co-conspirators. And under Rule 15, and this Court's precedent in Cruz v. Coach stores, if you prove that there was an agreement, and we did in the summary judgment papers, then to quote the language of the rule, conspiracy, quote, must be treated in all respects as if raised in the pleadings. Counsel, this is Judge Kobranitz of New Haven. Yes, Your Honor. I've followed the argument with great interest. I want your help to understand your argument. There will be a number of questions to make sure that I understand it. Because you've drawn a distinction between the summary judgment stage and the motion-to-dismiss stage. The district court held, did it not, that our mandates characterized the fraud that you allege as limited to specific misrepresentations about particular securities that were presented as being traded in a market that did not exist. Is that a fair statement? It's a fair statement of what the district court said, but it's not a fair statement of what this Court said. And the reason is that this Court was not talking about aiding and abetting when it dismissed the Federal 10b-5 and Rule 10b-5 claims, because under Central Bank, aiding and abetting is inapplicable in securities fraud cases. They were talking specifically about the requirements of Rule 10b and 10b-5 and statutory section 10b, that there be a specific misrepresentation. And that goes back to Stonebridge Partners, that you have to have a very close connection for 10b-5. But that's not true about aiding and abetting under State law, which is what this case is about. Well, help me some more. I want to go back to what the district court said, not necessarily what we may have said earlier. This case has gone on forever, of course. It has. The district court held, did it not, that the plaintiffs needed to show actual knowledge of the misrepresentations. Is that right? That's what the district court said. I disagree with that, but that's what he said. And it also said that Barron was only able to make those representations by making other representations about its legitimacy as a brokerage firm. Right? I believe so, yes, Your Honor. I believe that's what the district court said. And we rejected defendants' arguments about knowledge at the 12b-6 stage, right? That's correct. So if your clients had pleaded knowledge of the wrong fraud, wouldn't we have affirmed dismissal earlier on? If my clients had pleaded knowledge of the wrong fraud? Yes. If my clients' pleading was inconsistent with the argument I'm making today, this Court would have granted dismissal. Okay. And how was that issue presented, if at all, to the Court of Appeals earlier? Well, we had, in the Court of Appeals before, the argument was that the plaintiffs did not plead sufficient evidence of knowledge, actual knowledge, to hold the defendants liable and to avoid dismissal of the case. This Court disagreed with that argument and sustained the pleading below. Now, here at this stage, we go far beyond the pleadings. We submitted actual proof. And when we're talking about actual knowledge, proof sufficient to avoid summary judgment was provided by Roman Okun, who was the man who spoke to each one of the plaintiffs, and he made clear to them that Barron was not engaging in a fraudulent scheme. This Court's prior decisions saying that there is an implied representation as a matter of law whenever a broker sells stock to its customers, an implied representation, I cited in our opening brief, that the prices are being set by a free market. And here, none of the prices were being set by a free market. And Mr. Okun, both as a matter of fraudulent omission and as a matter of fraudulent representation, advised his customers, and his customers were all of the plaintiffs. He advised his customers that the prices were being set by a free market when he represented it was operating as a regular brokerage firm. So on that basis, there is zero question in my mind, I respectfully submit, that the summary judgment grant must be reversed. But it goes beyond that because we have established conspiracy as well as aiding and abetting. And conspiracy, if anything, is a broader concept than aiding and abetting. And as I said before, under Rule 15b-2 in Cruz v. Coach stores, conspiracy must be treated in all respects as if raised in the pleadings. And the district court said it wouldn't address conspiracy because there was no amended pleading. But it was proven on the summary judgment motion. It was proven beyond any doubt sufficient both tacit agreement for conspiracy and actual agreement. Even — Okay. Counsel, I think we have your argument. You are preserved some time for rebuttal. Thank you, Your Honor. We'll hear from that police. Good afternoon, Your Honors. Robert Horowitz for the Dweck defendants. And I want to focus on the actual knowledge issue. Your Honor asked the question of Mr. Folkenflik, whether the defendants needed to have actual knowledge of a fraud or the fraud. And I think the law is very clear. And Judge Cronin held that they needed to have actual knowledge of the fraud. They actually also need to have actual knowledge that they were lending substantial assistance to that fraud. And they also need to — the court would have to find that that substantial assistance proximately caused the trading losses from the plaintiffs resulting from that fraud. As Judge Cronin said, this isn't a roving inquiry into malpractice at Barron. It was the specific misrepresentations that were being made to the plaintiffs by the Barron brokers. That's what the Second Circuit Court of Appeals held the last time around. Okay. So on that point, Mr. Folkenflik said that just trading on a price you know is artificially inflated is itself the fraud. Do you agree with that or do you think that it needs to be that the seller is making some further representation? It needs to be a representation. When you're dealing with a pump-and-dump, there has to be a representation made to the plaintiff that they're pumping the stock up. In other words, so-and-so is going to have fantastic results next week, blah, blah, blah, purchase the stock. And this actually isn't even a pump-and-dump. Mr. Folkenflik refers to it sometimes as a pump-and-dump. He refers to it sometimes as a Ponzi scheme. It's a misrepresentation case with regard to how the prices are being set. That's what's alleged in the complaint. That's what the Second Circuit previously said the allegation is. Nothing's changed since then. So you're saying if the seller just says, buy these securities, here's the price, knowing the prices are artificially inflated, it's not a fraud. But if the seller says, here's the security, this is a genuine price, it's a good stock, then it would be a fraud. Well, we're dealing – the problem is in the securities case, federal securities case, there's a fraud on the market. Okay, so if somebody's making representations to the market to jack up the stock price, there's a fraud. New York law does not accept the fraud on the market theory. New York common law requires actual reliance on a misrepresentation. And Mr. Folkenflik keeps referring to an implied representation. That's in the first Jersey case that there's reasonable pricing. That's also a federal securities case, and it's been expressly rejected under New York common law, and that's in the granted – New York law doesn't allow the implied misrepresentation as your position. That's correct. It's in the granted – So it would make a difference, what I just said, whether they're saying something about the price being modified or the stock being good as opposed to just saying here's the price. Under New York common law, I think that's correct. So you don't dispute that the defendants knew that there was artificial market activity happening, right? No, we do dispute that. What we know – The district court does not think that they would have been aware that there was artificial market activity happening. The defendants, Mr. Dweck in particular, had no idea what trading was going on with other customers, how other customers were treated. He said that point blank in his deposition testimony, that he had no idea about that. Right. So your position is even if they know that there's artificial market activity going on, the parking and wash sales in their own accounts, they wouldn't necessarily know what Barron is saying to the customers who are – That's correct. And that's exactly – Your position is it wouldn't be enough. I mean, maybe it would be a natural inference if just trading at that price was enough to be a misrepresentation. But New York law says there needs to be some kind of affirmative statement to the – That's contrary to what Mr. Folkenflik says. There is no – and there still is no evidence of that. There is – that goes for approximate cause argument. There's no – You say there's no evidence. What do you mean? I mean, obviously, the artificial market activity inflated the price, right? No, as the Second Circuit said, there's not even clear – when there's no market, we don't know how the prices were set by the Barron brokers. No relationship between the trading in the direct accounts and the purchases by the plaintiffs. There's no relationship in the prices and there's no effort to even tie the trading. In other words – – doing all of this fraudulent market activity to inflate the price, but then they just – they just randomly assigned a price when they were selling it to the buyers? DREX don't know. DREX have no idea. Number one, they don't know what was said to the plaintiffs. And number two, they don't know whatever was said to the plaintiffs was false. They had nothing to do with setting prices. I think the – a couple of other points I just wanted to make. Constructive knowledge, as Mr. Folkenflik said, that the defendants would have to know that there was fraud going on. Constructive – I'm sorry. Yeah, constructive knowledge is not actual knowledge. The law in New York is very clear on that front. Mr. Okun's statement says absolutely nothing about – You can infer actual knowledge from, you know, indirect evidence or some essential evidence, right? That's correct. So there would be an intuitive argument that says, well, if the Wolfsons and the Dwecks know that their accounts are being used to pump up the price of the stock through parking and wash sales and maybe some other activity, they would know that Barron was selling the shares at that inflated price. There's no evidence that they do – that the shares price was being artificially inflated by the activity in their accounts. And, in fact, Your Honor previously referred to the fact that the SEC and the Second Circuit previously recognized that the more likely scenario was that Barron was using that alleged parking activity to meet the net capital requirements as opposed to being – You're suggesting that maybe they thought that the artificial market activity was being done for a different reason. But you're saying they didn't even know that there was artificial market activity despite it happening in their own accounts? They knew they were purchasing and selling securities. They made money sometimes. They lost money other times. But they certainly did not know and did not have direct knowledge, actual knowledge, circumstantial or otherwise, that the plaintiffs were being injured by anything that the Dwecks were doing in their accounts. And Mr. Okin's declaration that Mr. Falkenflik relies on so heavily says nothing about an agreement with either of the defendants to engage in a fraud of the plaintiffs. All he says is that they were – there was an agreement that they would be treated favorably. Favorable treatment does not equate to fraud on the plaintiffs. Merrill Lynch does favorable treatment for many of its customers. They get favorable IPO opportunities. That doesn't mean that anybody else is being defrauded. Mr. Bressman's declaration doesn't even mention the Dwecks. So we can't say – I mean, that's completely irrelevant. So there's no evidence whatsoever in the record of any actual knowledge, direct evidence or circumstantial evidence. Judge Cronin considered all of the circumstantial evidence and clearly found that it was insufficient to demonstrate actual knowledge. Thank you, counsel. We'll hear from Mr. Kirby next. Thank you.  Thank you, Your Honors, and may it please the Court. I'd like to address a threshold standing issue and then come to the question that has been much of the discussion before about this actual knowledge question. Because I think that the lack of standing, which is an independent basis for dismissing this case, is simply put – showed that the plaintiffs cannot receive anything in this case. And that's where we stand at this point. The facts on the lack of standing are in the record, are uncontested. In September of 2000, 25 years ago, in the Barron bankruptcy case, the plaintiffs received $4.1 million of damages from the bankruptcy case. And the plaintiffs, as a condition of that, assigned their claims in this case to the trustee. That was a court-imposed condition. That's what happened. We held in fund liquidation holdings that a pre-suit assignment does not extinguish Article III standing. Why is this different than after? That's not the point of the why if there's no standing. The point of the no standing is that they cannot recover anything in this case that they have not already received. So that assignment happens after the lawsuit starts, right? That does. So really you're saying the lawsuit kind of became moot once they got the money and assigned it to the plaintiff? That is exactly right. And you're saying that the reassignment from the trustee back to the plaintiffs needed court approval and didn't receive it, right? Not only that, but there was a specific release that was – in 2003, there was a settlement with the Wolfsons by the trustee. All right. So it could be either way. So either it's a reassignment from the trustee back to the plaintiffs, in which case it needed court approval, or the claim still belongs to the trustee, in which case it was released. Correct. But if there was a reassignment back to the trustee, there would have had to have been court approval in Judge Park. That is where this court in the Crease case, rising out of Madoff, is very specific that a trustee is not free to reassign back or assign a claim without specific bankruptcy court approval. Not only is that the point of that case, but there are – I don't know if that's true in general, but the point is that the initial assignment said these are going to be assigned to the trustee and any modification requires court approval. Exactly. The terms of the initial release said that it needed approval. I don't know if it had to say that, but that's what it said. Exactly. And then – Why isn't that an issue, the right to recovery, something that the plaintiffs and the trustee sort out afterwards? It doesn't strike me as an Article III lack of interest. It's Article III because of another fact, which is part of the law of the case. In this case, in 2004, Judge Casey dismissed all unauthorized trade claims from this case and said specifically in their amended complaint there should be no unauthorized trade claims. In the summary judgment record as submitted before the court, and Judge Cronin specifically recognized that that unauthorized trade part of the case was not part of the – was part of the law of the case, and therefore the claim of fraud in this case is only trades that were authorized by the plaintiffs. Undisputed in the record before the court, but in the summary judgment record, is that 2.9 million of the 4.1 million claims of the plaintiffs are based upon unauthorized trades. Plaintiffs did not object to that in the summary judgment proceedings. Judge Cronin decided the case on other grounds, but the – because there's no standing, the best case claim that the plaintiffs can make in this case is $1.2 million. That's the best case, and they've already received, back in 2000, three times that amount. So that's why there's no standing, because there's nothing that the plaintiffs themselves – And wouldn't that be really a defense? So, like, you acknowledge that when the lawsuit commenced there was standing because the claims had not been assigned. They claim that the claims were reassigned back to them so they could pursue the lawsuit and so on. You might raise a defense that they're released or that these other claims are out of the picture and they can only recover so much. But why does that mean that there isn't injury causation and regressibility? Because there's – because the real question, based upon the recent Supreme Court cases, is standing is not a fixed concept. It's a dynamic concept. You look at standing at each stage of the litigation, and there can – standing cannot be based upon claims that, you know, counsel fees. Standing has to be based upon what they could actually – individual plaintiffs could actually collect in this case, and in this case they cannot recover anything because of what they've already received. That's what makes it – But if it were true that there were a valid – I understand you dispute this, but if there were a valid reassignment of the claims from the trustee back to the plaintiffs, they could recover that amount and reimburse the trustee. That would have an effect on – that would have a legal effect, right? In theory they could, but in this case that's an impossibility because the plaintiffs – this letter, and that's part of our cross-appeal, this letter at the time specifically said that it would pay – they said that they would pay money back to the trustee. But if they were going to do that, and they wanted to assert their rights under that letter, when various proceedings in the bankruptcy court happened, they as parties in the bankruptcy court got notice of all – of each of those, and they had those proceedings, and particularly the trustees accounting at the end of the case in the Wilson settlement agreement. For example, the trustee expressly in the provision in the settlement agreement denied that there was any reassignment, or any assignment that would affect the release of the – That was not in fact reassigned. Right, right. So when that was presented to the plaintiffs, they had an opportunity to say, you know, wait a minute, there's an assignment out here. They didn't do that, and under the Traveler's Indemnity case in the Supreme Court, which arose out of a Second Circuit case, a party to a bankruptcy case is bound by bankruptcy court orders. These plaintiffs were parties to all the bankruptcy proceedings, and therefore they're bound by all of those orders, and so that leaves – that leaves the – a legal impossibility for this letter to have survived the bankruptcy case, because they didn't bring it to the attention of the bankruptcy court. They waived the opportunity to do that. There were some assignments of claims from the trustee to other parties, right? Undoubtedly. I'm not aware of that. Because part of your evidence for why this was not a valid reassignment was because it was not in the list of assigned claims that the trustee provided at some point. The trustee gave an accounting at the end of the case in which he reconciled all of his assets that he held.  And some of those were assigned claims, right? There was a 2004 order closing the estate, and there was a list of open claims that the trustee had assigned. Yes, but he – all of those were resolved. And it did not include this one. No, it did not include this one. But did those other assignments get court approval, bankruptcy court approval? No. There were no others. He listed no assignments in his final report because he said all matters are resolved. He detailed in specific – in the record before the district court, there is a lengthy report that specifically details what assets remained in the trust, and he sought authority to abandon all remaining assets, including any assigned claims. That was part of his report. So any assigned claims. But I'm just saying, when there were other assigned claims, do we know from the record whether the bankruptcy court approved the assignment of those claims from the trustee? I don't – we don't know whether – you mean reassignment? Because the bankruptcy court ordered that there be a lot of – everybody who applied in the – to the restitution fund was required to assign claims. But the trustee sought authority in his final report to abandon certain of those assignments, those ones that were still outstanding. So you're saying that the phrase assigned claims refers to claims assigned to the trustee? Right. Okay. And then he documented those that remained outstanding, and in that report he sought authority to abandon them. And so therefore, that is what makes the bankruptcy proceedings critical to the question of standing. And in answer to your question, Judge Park, that's what makes this different, is that as parties to the case, any claims about remaining claims beyond what is in this case, they took no action to preserve them. Okay. Thank you, counsel. We'll hear from Mr. Browning. A very simple question. Yes, sir. You've run out of time, but I wanted to ask a bottom-line question. The district court held that it would be reasonable to infer that your clients had actual knowledge that Barron was fraudulent in some respect. Can we at least agree on that minimal statement? That our clients had actual knowledge? Yes. No. We totally disagree with that point. Judge Cronin specifically addressed that question. And, Your Honor, in your early questions to my colleague, you raised the question about what the court, the prior decisions in which Your Honor served, actually said. And Judge Cronin goes through them, and in page 7 and 8 of his opinion on summary judgment, he specifically says that what the only remaining claims are specific misrepresentations to the victims by Barron salespeople as to how the price they were charging in the particular securities were arrived at. That is the question at which actual knowledge needs to be directed. And there's nothing in the record, no evidence whatsoever, that the Wolfsons knew anything about what other customers were being charged, what other customers were being told, and had no knowledge of any other transactions by any other customers. In fact, the Wolfsons were indeed victims of the fraud and ultimately closed their accounts as a result of this because of unauthorized trading in their accounts. But on the issue of actual knowledge, Judge Cronin got it exactly right. And I would just mention that constructive knowledge is not sufficient to prove actual knowledge. The Wolfsons knew that there were unauthorized trading going on in their account, but that doesn't equivocate to actual knowledge. And so, no, Your Honor, I disagree with that. But they have actual knowledge of the unauthorized trading. What? They have actual knowledge of the unauthorized trading. Correct. But that's not the case. That's not the claim in this case. No, I understand. But I thought it was Judge Cronin's question that they had actual knowledge of some kind of fraud. Your position is just not the relevant fraud. That's correct.  Thank you, counsel. We'll hear from you. While I applaud my adversary's creativity, their presentation is unmoored from the record, from the decision below, and from the facts. Let me start with Mr. Kirby's presentation. What he's failing to recognize is that there was a restitution fund. It was established by the SEC, the District Attorney's Office of New York. And as a result of that, and the trustee acting as a trustee of the restitution fund, not the bankruptcy case, provided certain payments to my clients for losses they suffered during a specific period. That was called the Bear Stearns period, but not for losses that were incurred in prior periods. And my clients had losses exceeding the amounts they were paid. They — there is no dispute about that. They had about $4.6 million of losses. And in the Bear Stearns period, only a portion of that applied. There is no question of standing. There is also no question, and it is absolutely — But they assigned the claims to the trustee to get the payment, right? They assigned certain claims. In order to get the payment from the trustee from the restitution fund, they assigned claims they had against third parties, which would include these defendants, to the trustee. The trustee reassigned those claims to my clients in return for a promise to pay him $3.8 million. And that was a set-off. If they get more, then — If they get more, they keep it. And —  So that side letter that you described as a reassignment, was that approved by the bankruptcy court? That did not have to be approved by the bankruptcy court for several reasons. One, it was the restitution fund payment, not a bankruptcy court payment. As we point out in our — in our briefs, in our opening brief in particular, these were not claims that the trustee had in the bankruptcy proceeding under Kaplan, under settled law, under settled law. But you acknowledge that the claims were covered by the original assignment, right? Yes. But under settled law — And the district court — I'm sorry, the bankruptcy court ordered that and said any modification needs to be approved, right? The bankruptcy court said that if there was a modification of the stipulation of settlement between the SEC, the District Attorney's Office of New York, and the trustee, it would have — it should be presented to the court. And there's no evidence in the record that that stipulation and that modification was not presented to the court. They just cite the docket sheet of the bankruptcy proceeding, and this wasn't a bankruptcy proceeding. This was completely independent and separate from bankruptcy. And as I was — You're saying it could have been approved apart from the bankruptcy proceeding. Correct. The docket of the bankruptcy court is not evidence of whether it was approved. Whether it was approved — But we don't know. Not that it didn't require approval. No, my —  My — I'm making both arguments. I think that — that the bankruptcy court docket does not show it was not approved. The implication is that a highly experienced civic trustee failed to seek approval of the — of the reassignment that he made. I would also add that multiple times, multiple times, it was absolutely clear that the side letter was properly interpreted in accordance with New York law. Their argument that — that it wasn't a — a reassignment, it was a ratification under Rule 17, is — is false because Rule 17, by its expressed terms, and this Court's decision in — I think it's Bugliotti is the way you pronounce it — make absolutely clear that — that — that Rule 17 and the Rules Enabling Act makes absolutely clear that Rule 17 does not overcome State law standards of contract interpretation. The Rules Enabling Act says that the rules don't change the State law substantive law. So we have — you know, it is absolutely true that the side letter existed, that the side letter was approved, that they spent enormous amounts of time fighting over whether the side — I mean, you're saying it must have been approved because it was an experienced civic trustee and he would have gotten approval. I'm saying there's no evidence it was not approved. And we have a highly — a highly experienced civic trustee, highly recognized, who had this agreement with the Court. We also — the other parties to the agreement with the District Attorney's Office of New York, other parties, and as a result of that, there is no evidence in the record that it was not approved at all. And I'm not sure it even had to be approved. What would be the consequences? My event, do you think it's — even if it's right that it wasn't approved, would that be a question about standing? Absolutely not. It has nothing to do with standing whatsoever. And in addition to that, Your Honor, the agreement that said it should be approved if there's a modification doesn't say the consequence if it's not approved. It doesn't say that any change in the agreement would be void if it's not approved. Well, come on. If it says any modification needs to be approved, if the modification is not approved, the result is the modification is invalid. I mean, isn't that pretty straightforward? No, I don't — But there are arguments about why that's not how it happened here, but, like, that would be the meaning of the language. I do not think that the stipulation that was submitted to the Court and the comment saying modifications should be presented to the Court makes it clear that if there is some failure, that the modification is void. It wasn't in the stipulation. It wasn't in the restitution front order. Let me address for a moment the — Briefly, please. Briefly, the issue of unauthorized trades. I made clear in our opening brief, absolutely clear in our reply brief, that there is absolutely no legal basis for finding that unauthorized trades are not an element of damages, none whatsoever. And they don't cite any. They claim that in an earlier decision by Judge — in an earlier decision in the case, that was reversed by this Court. There was a comment that unauthorized trade shouldn't be allowed. But that decision was not sustained. And there is no legal basis for eliminating unauthorized trades. And let me just speak to Mr. Kirby — Mr. Horowitz for one moment. Mr. Horowitz — Wrap it up, counsel. I'll wrap it up. Mr. Horowitz claimed that he makes an argument that's never been raised before in briefing before this Court or in the Court below, that there is no implied misrepresentation under New York law. That's just not true. And, in fact, as I point out, with respect to the summary judgment motion, there were express representations by the salesman who communicated with the plaintiffs that the — that Barron was operating in a regular manner, rather than, in fact, engaging in trading that set prices only on behalf of its own manipulation, manipulation these defendants, the defendants represented by my colleagues, manipulation these defendants themselves engaged in. And we submitted the schedules from Mr. Kelly, our experts, showing all of the manipulative trading that they engaged in. And he pointed out that that manipulative trading, as an expert, he's entitled to take into account the SEC findings and the findings of the SIPC trustee, and he pointed out how all of their trading is exactly the type of trading that the SEC and the Barron trustee found was manipulative in evidence of fraud by Barron. So what I'm saying here is — Okay, counsel. Okay. Thank you. I'll stop. Thank you all. Thank you. We have no arguments. We'll take the case under advisement.